UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

HAROLD A. HUNT,

                                            Petitioner,

            vs.                                                    9:09-CV-934
                                                                   (NAM/ATB)

SUPERINTENDENT,

                                            Respondent.

_____

HAROLD A. HUNT, Petitioner, *pro se*
THOMAS B. LITSKY, Asst. Attorney General for Respondent

ANDREW T. BAXTER, United States Magistrate Judge

### REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation pursuant

to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[1]

        Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction rendered in the Saratoga County Court.

Petitioner was convicted on January 27, 2007 of Criminal Sale of a Controlled

Substance, Third Degree;[2] Criminal Possession of a Controlled Substance, Third

Degree[3] and Criminal Possession of a Controlled Substance, Fourth Degree.[4]

Petitioner was sentenced to concurrent determinate terms of six years incarceration,

_____

        [1] The case was originally referred to the Honorable Gustave J. Di Bianco and was
assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 8).

        [2] N.Y. Penal Law § 220.39(1).

        [3] N.Y Penal Law § 220.16(1).

        [4] N.Y. Penal Law § 220.09(1).

with two years post-release supervision, on the Third Degree Criminal Sale and Criminal Possession charges and three years incarceration for the Fourth Degree Criminal Possession charge.[5]

The Appellate Division, Third Department affirmed petitioner's conviction on April 11, 2008. *People v. Hunt*, 50 A.D.3d 1246, 855 N.Y.S.2d 736 (3d Dep't 2008). The New York Court of Appeals denied leave to appeal on September 12, 2008. *People v. Hunt*, 11 N.Y.3d 789, 866 N.Y.S.2d 615, 896 N.E.2d 101 (2008).  Petitioner filed this petition for habeas relief on August 17, 2009. (Dkt. No. 1).

Petitioner raises fifteen grounds in support of his petition:[6]

(1)     The police deliberately destroyed material evidence in petitioner's case. (Pet. at 11).

(2)     The prosecutor presented false testimony that was not given to petitioner until the eve of trial. (Pet. at 11).

(3)     The court improperly allowed the false testimony to be introduced at trial, when the defendant did not have time to prepare. (Pet. at 12).

---

[5] On August 19, 2010, petitioner filed a change of address, stating that he has been deported to Trinidad. (Dkt. No. 31).  Petitioner states that his deportation is a direct result of the conviction that he challenges in this case. *Id.*

[6] Several of these grounds relate to the same issue, and the court will consider many of the issues together.  The court has listed petitioner's claims separately as stated in the petition in order to ensure that all the issues are covered.  The court also notes that the form-petition is attached to a document entitled "Memorandum of Law." (Pet.; Dkt. No. 1 at 2) (the court is citing to the pages assigned to petitioner's application by the CM/ECF system because petitioner's pages are not consecutively numbered).  The grounds cited in the "Memorandum of Law" are not identical to those raised in the numbered paragraphs in the petition.  The court will base its analysis on the numbered grounds contained on pages 11-20 of the actual "petition" because some of the stray claims listed in the "Memorandum of Law" were never raised in any court. *See e.g.* (Pet. at 4) (violation of petitioner's right to present his own closing argument was never raised in any state court).

(4)     The court failed to instruct the jury regarding the lack of credibility of this "11th hour" testimony by a witness. (Pet. at 12).

(5)     The trial judge failed to grant a mistrial based on the admission of this false testimony. (Pet. at 14).

(6)     The prosecutor failed to inform the trial jury of "discredited testimony." (Pet. at 14).

(7)     The prosecutor failed to present the "agency defense" to the Grand Jury. (Pet. at 14).

(8)     The trial judge failed to give an "agency instruction." (Pet. at 14-15).

(9)     The trial judge failed to give an "entrapment" instruction on the Fourth Degree possession charge. (Pet. at 15).

(10)    The trial judge should have charged the "lead officer" with perjury because his testimony was inconsistent. (Pet. at 15-16).

(11)    The prosecutor improperly used a peremptory challenge to strike the only black juror. (Pet. at 16).

(12)    The court failed to give an instruction to "clarify" jury confusion when the jurors submitted questions during their deliberations. (Pet. at 16).

(13)    The petitioner was "entrapped." (Pet. at 17).

(14)    A combination of the errors denied petitioner a fair trial. (Pet. at 17).

(15)    Petitioner was denied the effective assistance of trial counsel.[7] (Pet. at 18-20).

Respondent has filed his answer, together with a memorandum of law and the

---

[7] Petitioner has asserted eight bases for his counsel's alleged ineffectiveness. The court will discuss them separately below.

pertinent state court records.[8] (Dkt. Nos. 13-15).  Respondent argues that some of the petitioner's claims are unexhausted and should be barred from federal review by procedural default.  Respondent argues that the rest of petitioner's claims fail on the merits.  For the following reasons, this court agrees with respondent in substance and will recommend dismissal of the petition.

## DISCUSSION

### I.   Facts

This action arises from a February 7, 2006 controlled purchase of cocaine from petitioner by informant, William Surprenant.  Petitioner was arrested immediately after the sale, and ultimately charged with Criminal Sale of a Controlled Substance, Third Degree; Criminal Possession of a Controlled Substance, Third Degree; Criminal Possession of a Controlled Substance, and Fourth Degree.

### A.   Pretrial Proceedings

Petitioner was arraigned on April 27, 2006. (Dkt. No. 15-14 at 1-9).[9]  Petitioner was represented by Oscar L. Schreiber, Esq. from the Saratoga County Public

---

[8] Some of the state court records are listed on pages 3 and 4 of respondent's answer. (Dkt. No. 13).  These records are listed as Exhibits A through J, and the court will refer to these documents by their exhibit letter.  Respondent has also filed petitioner's entire four-volume trial transcript, consisting of eleven "documents". (Dkt. No. 15-14 through 15-24).  Citations to (T.) refer to the actual transcript pages.

[9] Docket No. 15-14 contains transcripts from four different dates: April 27, 2006 (arraignment); September 8, 2006 (pretrial motions); November 6, 2006 (Molineux/Ventimiglia Hearing and discussion of defenses); November 6, 2006 (Molineux and Grand Jury issues); and November 22, 2006 (defense motions).  The pages of the transcripts are not consecutively numbered as are those in the trial transcripts, thus, the court will cite to the page numbers assigned by the CM/ECF system.

Defender's Office. *Id.*  At the arraignment, petitioner expressed displeasure with his attorney's performance because they "agree[d] on nothing." (T. 5; Dkt. No. 15-14 at 5).  The court allowed petitioner to argue that his assigned attorney should be relieved because he "lied" to petitioner, but the court explained that, although he had the right to assigned counsel if he could not afford a lawyer, petitioner did not have the right to have a particular counsel assigned. *Id.*  The court denied petitioner's motion to have Mr. Schreiber relieved, however, by the September 8, 2006 hearing, petitioner was represented by Daniel G. Chertok, Esq. from what appears to be a private law firm. (Dkt. No. 15-14 at 23).

At the September 8, 2006 hearing, Mr. Chertok indicated that petitioner was considering[10] advancing the defenses of entrapment and/or agency. (Dkt. No. 15-14 at 16).  The prosecutor then stated that if petitioner were going to assert either defense, the prosecution would move to admit evidence of any prior criminal activity by the petitioner that would negate either or both of the defenses. (Dkt. No. 15-14 at 11-15).  On November 6, 2006, after petitioner's counsel stated that he intended to raise both defenses, the trial court held a *Molineux*[11] hearing to determine whether the prosecution could produce evidence of prior bad acts or other uncharged criminal activity to rebut the assertion of these defenses. (Dkt. No. 15-14 at 23-57).

---

[10] At that time, petitioner's counsel had not fully decided which defense he was going to advance. (Dkt. No. 15-14 at 16).  During the November 6, 2006 hearing, he stated that he would present both defenses. (Dkt. No. 15-14 at 24).

[11] In a *Molineux* hearing, the court determines whether the prosecution can use a defendant's prior bad acts or crimes to prove an element of the crime for which the defendant is charged. *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 (1901).

During the November 6, 2006 hearing, the prosecutor also moved to introduce portions of the petitioner's grand jury testimony that could be considered "admissions," such as petitioner's statements about purchasing and smoking crack on a regular basis. (Dkt. No. 15-14 at 25-37).  The court also held a *Sandoval*[12] hearing to determine whether petitioner's prior convictions could be introduced if he took the stand to testify on his own behalf. (Dkt. No. 15-14 at 53-56).  The court reserved decision on both issues.

Defense counsel made a motion to dismiss the indictment based upon the prosecutor's failure to explain the "agency" defense to the grand jury.  At the same time, the court considered discovery requests made by petitioner's counsel. (Dkt. No. 15-15 at 60).  A hearing was held on this issue on November 22, 2006. (Dkt. No. 15-14 at 60-92).  During this hearing, the prosecutor stated that he had spoken to the confidential informant[13] "yesterday."[14]  Because Mr. Chertok mentioned that he was going to raise agency and entrapment as defenses, the prosecutor decided to ask the confidential informant how he met the petitioner. (Dkt. No. 15-14 at 85-86).  The informant told the prosecutor for the first time, that he had purchased drugs from petitioner before the charged transaction. (Dkt. No. 15-14 at 86).  That was how the

---

[12] In New York State courts, a *Sandoval* hearing is held to determine the extent to which a defendant will be subject to impeachment by cross-examination about prior convictions if he testifies. *See People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974); *People v. Dokes*, 79 N.Y.2d 656, 660, 584 N.Y.S.2d 761 (1992).

[13] The prosecutor was referring to Mr. Surprenant.

[14] "Yesterday" would have been November 21, 2006.

informant obtained petitioner's telephone number to give to the Task Force. *Id.*

Defense counsel argued that this information was particularly prejudicial and "would overwhelm so much else in this case." (Dkt. No. 15-14 at 88).  The court ruled that the evidence would be admitted on the same basis that the court admitted petitioner's grand jury testimony, but asked both attorneys for a written proffer, stating that the court would "revisit" the issue on "Monday."[15] (Dkt. No. 15-14 at 90).

On November 27, 2006, Mr. Chertok argued strenuously that the court should not admit the late evidence. (Dkt. No. 15-15 at 2-5).[16]  Mr. Chertok argued that he had another version of how the informant met petitioner, but Mr. Chertok was unable to locate the witness who could testify to that meeting. (Dkt. No. 15-15 at 2-5).  Defense counsel sought to preclude the informant's testimony regarding this prior sale, but the court denied the motion, stating that although the production by the prosecutor was late, defense counsel had enough time over the weekend to locate the witness. (Dkt. No. 15-15 at 4-5).  After denying petitioner's motion to dismiss the indictment based upon the prosecutor's failure to charge the grand jury about the agency defense, the court proceeded to jury selection. (Dkt. No. 15-15 at 14-15).

## B.    Jury Selection

There were 60 jurors in the pool. (T. 15)  The jurors were told about the charges against petitioner, given general instructions, and the judge explained that the

---

[15] "Monday" would have been November 27, 2006.  This was Thanksgiving weekend.

[16] The transcript of November 27, 2006 (Dkt. No. 15-15) begins the multi-volume trial transcript. The trial transcript pages are consecutively numbered so the court need not cite to the CM/ECF assigned page, and will cite only to the page of the trial transcript (T.).

attorneys would be asking questions about the prospective jurors' backgrounds and experiences. (T. 17-21).  There were 21 prospective jurors in the first round of jury selection, and at the end of that round, 6 jurors were seated. (T. 18, 105).  Twenty-one more individuals were chosen for the second round. *Id.*  Juror 95 was Jalisa Williams, and she was Juror 17 in the second round. (T. 107).

At the beginning of the questioning during the second round, the court asked standard questions about whether the jurors knew any of the people who were involved in the case, either for the prosecution[17] or for the petitioner, or whether any of the jurors had relatives who were lawyers.[18] (T. 109-21).  Ms. Williams stated that her cousin was an attorney in the District of Columbia, but Ms. Willams did not know what type of law her cousin practiced, and did not know whether her cousin practiced any criminal law at all. (T. 119).  Ms. Williams stated that she did not speak to her cousin on a regular basis, and that her relationship with her cousin would not affect her objectivity in the case. *Id.*

Later during the court's preliminary questioning, the judge asked the potential jurors whether the fact that the defendant was a "person of color" would "create a problem with anyone with regard to fairness and objectivity." (T. 132).  The court specifically asked Ms. Williams whether she would feel pressured by the fact that she

---

[17] Various potential witnesses had ties to law enforcement. (T. 113).  One juror had a brother who was in the FBI, one juror had relatives who worked for the Montgomery County Sheriff's Department, one juror's husband was a corrections officer, and one juror was a corrections officer. (T. 113-15).

[18] There were several potential jurors who were related to, or worked with, attorneys. (T. 117-21).

was a "person of color," who would probably be serving with "eleven people who are Caucasian." (T. 132).  The judge asked whether this fact would "cause you to favor or disfavor him more or less . . . ." *Id.*  Ms. Williams responded "no" to both questions. *Id.*  Ms. Williams stated that she was not married, was a Civil Service employee, working as a Classification and Compensation Analyst, and was a graduate student. (T. 143).

When the attorneys took over the questioning, the prosecutor asked Ms. Williams about her job as a Classification and Compensation Analyst. (T. 160).  Her job involved analyzing requests from agencies for certain types of employees. (T. 160).  Ms. Williams stated that her department "would look at the facility, and see if that facility warrants [the type of employee that it requested]." *Id.*  Defense counsel questioned the jurors closely about their feelings regarding the use and possession of drugs and the potential defense of entrapment, notwithstanding an objection by the prosecutor. (T. 163-67).  After the prosecutor's objection, the court clarified the meaning of entrapment, and explained to the potential jurors that if the entrapment issue came up at trial, the court would instruct them on how to evaluate the facts. (T. 167-68).

Defense counsel also reviewed the concept of "agency" with the potential jurors. (T. 168-77).  Several individuals had issues with the defenses discussed by defense counsel, however, Ms. Williams stated that she knew the difference between entrapment and agency; and said: "I'm open-minded to look at the evidence and what it is." (T. 177).  Counsel and the court then discussed the effect of raising these issues

9

with the potential jurors and whether it might have confused them. (T. 178-83).  The

court told defense counsel that he had probably gone too far during that round by

questioning the jurors on their attitudes regarding issues of law, but allowed the jury

selection to continue, after warning defense counsel that he should not continue to

engage in such a detailed discussion about legal issues. (T. 182).

At the end of the second round of questioning, the court asked counsel for their

challenges to the jurors.  After several "for cause" and peremptory challenges, the

prosecutor used a peremptory challenge to strike Ms. Williams. (T. 186-87).  Defense

counsel objected immediately, stating that Ms. Williams was the only African-

American on the panel, and challenging the peremptory based on "*Batson*."[19]  Defense

counsel stated that

> we got a black Defendant.  I think that in a predominantly
> white county, you got a black person on the jury, it gives us
> half a shot of some racial considerations that we might not
> otherwise get, and I would be concerned if jurors may be –
> maybe just maybe . . . – not being honest to the Court about a
> possible racial bias, and that coming out later . . . in the jury
> room; whereas if Miss Williams was there, obviously that
> wouldn't happen, so I just raise that challenge.

(T. 187).  The judge found that defense counsel had not established a prima facie case

of discrimination based on the prosecution's use of a peremptory challenge to strike

Ms. Williams.  *Id.*  Because of that finding, the judge stated that he would not require

the prosecutor to give a race-neutral reason for the strike, and denied defense

counsel's *Batson* challenge.  Jury selection was completed after a third round, during

---

[19] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

which no further issues arose. (T. 191-67).

### C.    The People's Case

At trial, Saratoga County Sheriff Sergeant Keith M. Clinton testified that Mr. Surprenant was arrested for drug possession in October of 2005, and as a result, he agreed to work as an informant in exchange for Sergeant Clinton agreeing to speak with the District Attorney on Mr. Surprenant's behalf.[20] (T. 313-14).  Mr. Surprenant testified that, after speaking with Sergeant Clinton, he agreed to cooperate with the Task Force. (T. 405).  Mr. Surprenant then testified that in late December of 2005 or early January of 2006, he was on "another binge" and was "looking for coke," when he saw the petitioner, who waved Mr. Surprenant down to ask him what he wanted. (T. 407).  Mr. Surprenant testified that, although he had been told by the "Task Force" not to make any drug purchases without the officers' authorization, he purchased cocaine from the petitioner at that time. (T. 407-08).

On February 6, 2006, Mr. Surprenant spoke with Sergeant Clinton about arranging a cocaine purchase from petitioner. (T. 409).  Mr. Surprenant testified that he made "some" telephone calls to petitioner about "making a deal" on February 7th. (T. 410).  Petitioner agreed to the deal, and Mr. Surprenant stated that he called petitioner again just after midnight, and again the next morning, to confirm that the sale was going to take place. (T. 410).  During the telephone call that Mr. Surprenant initiated after midnight on February 6, 2006, he and the petitioner discussed the

---

[20] At trial, Sergeant Clinton testified that no other promises were made to Mr. Surprenant in exchange for his cooperation. (T. 314).

quantity of drugs and the price. (T. 410).  Mr. Surprenant told petitioner that he had $1,500.00 and that he would like to purchase close to an ounce, or as much as he could get for the money. (T. 411).

Mr. Surprenant then went to the Sheriff's Department and met with Sergeant Clinton, who asked whether "everything was still on." *Id*.  Upon confirming that the cocaine purchase was "still on," the officers searched Mr. Surprenant and his car to make sure that he did not already have any drugs. (T. 317-18, 411).  Mr. Surprenant testified that "some more" telephone calls were made, and then he went to meet petitioner at the agreed upon location,[21] with $1,500.00, given to him by the officers. (T. 411-12).  Mr. Surprenant stated that petitioner never refused to sell him the drugs, instead, petitioner called Mr. Surprenant to verify that he had the correct amount of money. (T. 411).

In addition to the money, the officers furnished Mr. Surprenant with "some kind of a transmitter." (T. 412).  However, as Mr. Surprenant was driving to meet petitioner, the officers determined that the equipment was not working properly, and they called Mr. Surprenant, who stopped the car so that the officers could "play with the transmitter." *Id*.  Apparently, the equipment was broken, so it was decided that Mr. Surprenant would put his cellular telephone on "speaker" and place it on the dashboard of the car, hoping that it would act "like a transmitter." *Id*.  Mr. Surprenant called the officers with the cellular telephone, and the telephone stayed on the

---

[21] Petitioner and Mr. Surprenant agreed to meet at a carwash in Waterford, New York. (T. 411-12).

"speaker" setting during the transaction. (T. 413).

Mr. Surprenant testified that he drove to the carwash and began to clean out his car. (T. 413).  Approximately five minutes later, the petitioner pulled into one of the bays, got out of his car, and got into Mr. Surprenant's car after directing him to do so. *Id.*  Petitioner told Mr. Surprenant to "pull into the bay." (T. 414).  Mr. Surprenant then asked petitioner for the "product," and petitioner handed him the cocaine. *Id.*  Mr. Surprenant stated that the drugs "felt real light." (T. 415).  Mr. Surprenant told petitioner that because the drugs were light, Mr. Surprenant was not going to give him the entire $1,500.00. *Id.*  Instead, Mr. Surprenant gave petitioner $1,300.00, and petitioner told him that they would "make it up on the next deal." (T. 414, 415).  Mr. Surprenant said "good deal" and signaled the officers by turning on his headlights. *Id.* The additional signal was necessary due to the broken transmitter. *Id.*  As soon as the officers saw the lights, they moved in and arrested petitioner and the two occupants of his car, Jamel Patterson and Nekiya Chase. (T. 330,[22] 381-82,[23] 415-16, 453).  The $1,300.00 was recovered from petitioner's jacket pocket.[24] (T. 488).  Petitioner was going to give "J" $1,200.00 and split the remaining $100.00 with Nekiya Chase.[25] (T. 489).  He intended to use his portion of the money to purchase crack cocaine and

---

[22] Testimony of Saratoga County Sheriff Sergeant Keith M. Clinton.

[23] Testimony of Saratoga Springs Police Investigator Christopher Kuznia.

[24] This information was not direct testimony at trial.  The court read petitioner's Grand Jury testimony into the record. (T. 474-97). The court informed the jury that "[a]s a result of certain pre-trial proceedings, I have allowed portions of the Defendant's grand jury testimony to be introduced by the People as part of their case in chief at this trial." (T.  474).

[25] This was part of petitioner's Grand Jury testimony that was read into the record.

celebrate his birthday. (T. 489).

### D.   Petitioner's Case

Petitioner took the stand in his own defense. (T. 623-717).  Petitioner testified about his troubled childhood and his addiction to crack cocaine, stating that he first became "hooked" in 1984 in Brooklyn, New York. (T. 624-31).  Although he went through periods of sobriety, he always relapsed, to the point where he attempted to commit suicide. (T. 628-36).  Petitioner testified that his final relapse was in 2005, and he continued to use crack cocaine from 2005 until he was arrested for these charges in February of 2006. (T. 646).  When petitioner first relapsed, he would go to other peoples' houses to use drugs, but at the end of 2005, people began going to petitioner's house to use drugs. (T. 649).  Petitioner testified that he had a group of approximately eight friends that would come to his house at different times. (T. 650).  In groups of three or four, petitioner and his friends would smoke crack, play chess, play cards, or listen to music. (T. 650-51).

Petitioner testified that his friends brought their own drugs to use, and that he never sold them drugs. (T. 651).  However, sometimes when his friends arrived without drugs, they asked petitioner to "call someone." (T. 651).  Petitioner stated that he knew people who were "drug dealers," who would bring the drugs to petitioner's house, but who would never "hang around and sell drugs." (T. 652).  Petitioner testified that, although he never sold drugs at his home, "[a]nything that came into my house, I smoked." (T. 652).

Petitioner testified that he met Bill Surprenant through a friend of his, named

14

Tracy." (T. 656).  Tracy brought Surprenant over to petitioner's house in early January 2006 to "hang out." (T. 656-57).  Petitioner stated that the first time that Tracy brought Surprenant to petitioner's home, he, Nekiya,[26] Tracy, and Surprenant all sat down to use drugs, after Nekiya called one of her friends from whom she purchased them. (T. 657).  Petitioner stated that Surprenant stayed at petitioner's house for two-and-one-half days. (T. 658).  During that time, Nekiya would make a telephone call, and an individual would come over with drugs. *Id.*  Petitioner stated that Surprenant paid for the drugs, the group would "use for a couple of hours, and then when they ran out, [Surprenant] would purchase some more. *Id.*  Petitioner stated that he did not sell Surprenant drugs during those two-and-one-half days. *Id.*

Petitioner claimed that Surprenant's testimony about petitioner flagging Surprenant's car down was "ridiculous." *Id.*  Petitioner explained his grand jury testimony wherein he stated that petitioner believed that Surprenant was "legit" when he said that he wanted to purchase drugs because Surprenant had "spent quite a bit of money" at petitioner's home. *Id.*  Petitioner claimed that his comment was in reference to Nekiya getting the drugs for Surprenant. *Id.*

Petitioner testified that he next spoke with Surprenant, when he called petitioner and asked him if he or Nekiya could get some drugs for Surprenant and bring them to Waterford. (T. 662).  Petitioner claims that he refused, but that Surprenant called him back four or five times. (T. 663).  Finally, on February 6 and February 7, 2006,

---

[26] Petitioner testified that he met Nekiya at a friend's house. (T. 655).  Nekiya used to "stop by [petitioner's home] from time to time. *Id.*  One day, she told petitioner that she did not have anywhere to stay, and he let her stay at his house. *Id.*

Surprenant called petitioner and "became insistent" about getting drugs, and told petitioner that "you guys can make a couple of hundred dollars off the deal." (T. 663-64).  Petitioner testified that Surprenant asked if either petitioner or Nikiya could get the drugs. (T. 664).  Petitioner testified that when Surprenant called on February 7, petitioner was "kind of tired of him calling . . . , but it was [petitioner's] birthday," and he saw this as an opportunity to get some crack. (T. 665).

Petitioner stated that Surprenant called twice more on February 7, and petitioner told Surprenant that Nekiya was unsuccessful in obtaining the drugs, but that petitioner would "try to call a couple of people." (T. 667).  Petitioner had a list with a few names on it, and he began calling. (T. 668).  His first call was unsuccessful, but he was able to get in touch with a dealer named "J." *Id.*  Petitioner explained the situation to "J," stating that a friend had $1,500.00 and wanted to purchase some crack. *Id.*  "J" agreed to get the drugs, but told petitioner that he could not drive him to deliver the drugs, so "J" would leave the drugs with petitioner, and petitioner would have to deliver the drugs himself. (T. 670).  Petitioner testified that he was able to get a ride with a friend named Jamel Patterson. *Id.*

"J" brought petitioner the drugs, and told petitioner to call him when he got the "$1200." (T. 671).  Petitioner stated that he did not spend time "hanging out" with "J," because "J" was a drug dealer, and drug dealers were "[v]ery dangerous people," who did not usually "smoke their inventory." *Id.*  Jamel Patterson came to pick petitioner up, but asked petitioner to drive to Waterford, where they went to deliver the drugs to Surprenant. (T. 674).

On cross-examination, petitioner stated that although he and Nekiya negotiated "that specific deal," they did not negotiate "deals, as [the prosecutor] put it." (T. 683). Petitioner then attempted to explain that although he did not negotiate "deals," if a friend wanted drugs, petitioner would "call someone" who could bring the drugs to petitioner's house and "give it [sic] to the person." (T. 684). Petitioner admitted that he and Nekiya put together the "deal" involving Surprenant, and "he offered [them] $200.00 for it." (T. 685). Petitioner stated that, before he called "J," he called two other people in order to obtain the drugs. (T. 686-87). Petitioner told "J" that Surprenant "had spent a lot of money at the [petitioner's] house." (T. 690).

"J" brought the drugs to petitioner's house and gave them to petitioner. (T. 691). "J" told petitioner to call him when he got the money. (T. 693). Petitioner testified that he had dealt with "J" "maybe ten times. (T. 693). Petitioner then called Jamel Patterson and told him that he "had some business to take care of, so Patterson came over to pick up petitioner, however, he asked petitioner to drive. (T. 695-96). Petitioner, Patterson, and Nekiya Chase drove to the car wash in Waterford, New York[27] with the drugs. *Id.* Petitioner got into Surprenant's car and put the drugs on the floor of the vehicle. (T. 700).

The prosecutor then asked petitioner about the money. (T. 700). Surprenant told petitioner that he had $1,500.00 and that "[petitioner] could make a couple hundred dollars off of the deal." (T. 700). When Surprenant complained about the amount of crack that petitioner brought him, petitioner lowered the price to $ 1,300.00

---

[27] Waterford is in Saratoga County. (T. 698).

(T. 702).  The prosecutor asked whether petitioner "negotiated that on [his] own," to which petitioner responded that "Yeah, because anything from 12- to 15- is mine." *Id.* Petitioner did not have to call anyone to change the price because "J only expected $1,200 back." (T. 702).  Petitioner was originally expecting to "profit" $300.00, but he settled for $100.00. (T. 703).

Sergeant Clinton was recalled as a witness for petitioner. (T. 528-35).  He testified that petitioner had no prior criminal history involving the sale of drugs. (T. 533).  Sergeant Clinton also conceded that Surprenant never told Sergeant Clinton directly that Surprenant had previously purchased $800 to $1,000.00 worth of drugs from petitioner. (T. 529).  Sergeant Clinton testified that the first time Surprenant mentioned any previous purchases from petitioner was at a meeting with the prosecutor shortly before the trial. (T. 529).  However, defense counsel pointed out that Surprenant testified that he told the police and the prosecutor about his prior purchase from petitioner at the time of Surprenant's grand jury testimony, eight months prior to the trial. (T. 530).

Petitioner's domestic partner,[28] Deidre Turner, testified on his behalf. (T. 588-623).  She testified that a couple of weeks after petitioner was arrested, she received a message on their telephone answering machine from Surprenant. (T. 609).  Ms. Turner testified that Surprenant identified himself as "'Bill . . . the guy you made dinner for." (T. 610).  Ms. Turner stated that the message was to "tell Harold that what happened

---

[28] Although petitioner and Ms. Turner were not married, she testified that they had been "domestic partners" for about 15 years and referred to each other as husband and wife. (T. 588-89).

was wrong.  The police shouldn't have done that to him,' and that he was sorry." *Id.*
On cross-examination, Ms. Turner testified that she tried to keep the recording,[29] and
she was "going to get a tape player to play it." (T. 620).  She also testified that it was a
digital answering machine, so there was no audiotape. (T. 619).  She testified that the
message was erased because she lived in an old house, "the lights flicker, and it causes
the electric to jump, and it erased everything." (T. 620).  At the time of the trial, Ms.
Turner testified that she no longer had the same answering machine. *Id.*

Petitioner could not dispute that the transaction took place, however,
petitioner's defenses were that he was entrapped, and that notwithstanding the
entrapment, he was only an agent of the actual drug dealer.  On December 4, 2006, the
jury rejected petitioner's version of the events and found petitioner guilty of all three
counts. (T. 907).

## II.    Procedural History

### 1.    Petitioner's Direct Appeal

Petitioner's new counsel, Mark Diamond, Esq., raised five claims on appeal.
(Resp. Ex. A, Dkt. No. 15-1, Pet. Br.).  Petitioner's counsel argued that

1.    The trial court violated petitioner's rights under *Batson*.
2.    The trial court improperly refused to charge the agency defense.
3.    The trial court improperly read petitioner's grand jury testimony to the jury.
4.    The police intentionally destroyed *Rosario* material.
5.    The conviction was against the weight of the evidence and unsupported by legally sufficient evidence.

---

[29] She testified that it was a digital answering machine, so there was no audio tape. (T. 619).

*Id.* Petitioner filed a *pro se* supplemental brief raising the following claims:

1.  The prosecutor violated the Due Process Clause of the New York State Constitution.
2.  The police improperly destroyed tape recorded evidence.
3.  The prosecutor failed to instruct the grand jury on the agency defense.
4.  The prosecutor elicited false testimony and failed to correct it.
5.  The trial court allowed the false testimony into evidence.
6.  The trial court should have declared a mistrial or deliver any curative instructions after the confidential informant testified about an uncharged drug sale by petitioner.
7.  The trial court erred when it failed to charge the entrapment defense for the Fourth Degree Criminal Possession charge.
8.  The trial court erred when it precluded the impeachment of a prosecution witness.
9.  The trial court did not give a meaningful instruction in response to a jury note requesting the definitions of certain terms.
10. Trial counsel was ineffective because:
    a)  he betrayed his client's confidence when he gave the prosecutor information about the informant's call to petitioner two weeks after petitioner's arrest (Ex. C at 49-50);
    b)  he undermined petitioner's motion for dismissal of the indictment by referencing another defendant's case (*Id.* at 50-51);
    c)  he opened the door for the prosecutor's admission of false testimony and did not properly remedy the situation (*Id.* at 51-55);
    d)  he failed to call Nekiya Chase as a witness (*Id.* at 55-56);
    e)  he failed to call an expert on addiction (*Id.* at 56-57);
    f)  he failed to introduce a "partially audible" audio tape into evidence (*Id.* at 57-58);
    g)  he told the court that petitioner was a drug dealer at the charge conference. (*Id.* at 58);
    h)  he gave a "largely irrelevant an[d] incoherent summation (*Id.* at 58-60).

(Resp. Ex. C; Pro Se Br.; Dkt. No. 15-3).

The Appellate Division affirmed the petitioner's conviction. *People v. Hunt*, 50 A.D.3d 1246, 855 N.Y.S.2d 736 (3d Dep't 2008) (Resp. Ex. G).  The Appellate

Division denied petitioner's *Batson* claim, agency and entrapment instruction claims, and *Rosario* claims on the merits with an explanation. *Id.* 50 A.D.3d at 1247-48.  The court held that petitioner failed to preserve his claim that the court improperly read his grand jury testimony at trial. *Id.* at 1248.  Finally, the court stated that "[w]e have examined the other issues raised by defendant and conclude that they are meritless." *Id.*  The court did not include an explanation of this final ruling. *Id.*

Petitioner applied for leave to appeal to the New York Court of Appeals, requesting that the court consider all the issues raised by counsel, as well as those issues raised in petitioner's *pro se* supplemental brief to the Appellate Division. (Resp. Ex. H; Dkt. No. 15-11)  As stated above, the New York Court of Appeals denied leave to appeal. *People v. Hunt*, 11 N.Y.3d 789, 866 N.Y.S.2d 615, 896 N.E.2d 101 (2008).  Petitioner does not claim that he made any collateral challenges to his conviction.

## III.  Procedural Review

### A.   Legal Standards

#### 1.   Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365, (1995) (internal quotation and other citations omitted); 28 U.S.C. § 2254(b)(1).  The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with

powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

There are "a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)). An exception to this rule occurs if the state court must necessarily reject the federal claim when ruling on the state law claim. *See Jackson v. Edwards*, 404 F.3d 612, 618-21 (2d Cir. 2005).

### 2.    Procedural Bar

If petitioner has failed to exhaust his state court remedies, but no longer has remedies available in state court, then the claims are "deemed" exhausted, but may also be barred by procedural default. *Bossett v. Walker*, 41 F.3d at 828 (citing *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)). A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations

22

omitted).  "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation.  *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

### 3.    Non-Cognizable Claims

"Federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  *Estelle v. McGuire*, 502 U.S. 62 67-68 (1991) (citations omitted).  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*.  Generally, claimed errors in evidentiary rulings and in jury instructions are matters of state law and are not cognizable in a federal habeas proceeding. *Estelle*, 502 U.S. at 72-75 (citation omitted).  These errors are not subject to *habeas* review **unless** they deprive a defendant of a fundamentally fair trial. *Id*.

### B.    Application

In this case, respondent argues that petitioner failed to exhaust many of his claims because, although he raised the claims on direct appeal, he failed to raise the claims in "constitutional terms," and they are not claims that immediately bring to mind a right protected by the federal constitution. (Resp. Mem. at 10-12).  Respondent states that two of petitioner's ineffective assistance of counsel claims were never raised in any state court, rendering these two claims unexhausted.  Because petitioner

cannot return to state court to exhaust these claims, respondent further argues that the unexhausted claims must be dismissed based upon procedural default.

Respondent argues that the following claims were never raised in any state court:

> (1)   Counsel failed to object to when the "lead officer" committed perjury. (Part of Claim No. 15).
> (2)   Counsel failed to introduce Nekiya Chase's statement to the police. (Part of Claim No. 15).
> (3)   The trial judge should have charged the "lead officer" with perjury. (Claim No. 10).

Respondent argues that the following claims are unexhausted due to petitioner's failure to raise them in constitutional terms:

> (1)   The prosecutor failed to present the "agency defense" to the grand jury. (Claim No. 7),
> (2)   The court failed to give an agency instruction. (Claim No. 8).
> (3)   The court failed to give an entrapment instruction on the Fourth Degree possession charge. (Claim No. 9).
> (4)   The court failed to give an instruction to "clarify" jury confusion. (Claim No. 12).

### 1.   Ineffective Assistance of Counsel Claims

A review of petitioner's state court briefs, submitted by both defense counsel and petitioner *pro se* show that respondent is correct in arguing that petitioner has never raised the claim that counsel was ineffective when he failed to object to the lead officer's "perjury."  Thus, the claim is unexhausted.  Petitioner cannot return to state court to raise this claim because he failed to raise it on appeal, thus the claim is also procedurally defaulted. *See Linnen v. Poole*, 689 F. Supp. 2d 501, 545 (W.D.N.Y. 2010) (citing N.Y. Court Rule § 500.10, stating that only one direct appeal is allowed,

24

and the state court will deny a collateral motion to vacate when the issue was apparent from the trial record and should have been raised on appeal).  Petitioner has not shown cause for his failure to raise this issue since he raised other claims regarding this allegedly false testimony.  He has also failed to show actual innocence to excuse the procedural default.  Therefore, this aspect of petitioner's ineffective counsel claim may be dismissed.

In his *pro se* supplemental brief to the Appellate Division, petitioner raised only the claim that counsel failed to call Nekiya Chase as a witness. (Dkt. No. 15-3; Resp. Ex. C at 57-58; Pro Se Supplemental Brief at 55-56).  In his federal habeas corpus petition, petitioner now claims, in addition to various other alleged deficiencies in counsel's performance, both, that counsel was ineffective because he failed to call Nekiya Chase as a witness, and that counsel was ineffective because he failed to introduce Nekiya Chase's statement to the police as evidence. (Dkt. No. 1 at 19). Petitioner claims that Ms. Chase's statement to the police would have "supported defendants [sic] position that he was not a drug dealer." *Id.*

To the extent that the claim about introducing Ms. Chase's statement is separate from petitioner's claim that counsel should have called Ms. Chase as a witness, petitioner never raised the claim in any state court, rendering the claim regarding the statement unexhausted.[30]  Petitioner cannot go back to state court to raise this issue because he should have raised it on appeal, and therefore, the claim is procedurally

---

[30] Petitioner may have simply been attempting to show that counsel should have called Nekiya Chase as a witness, based upon her statement to the police.  If so, there would only be one claim, it was exhausted, and there would be no need to consider procedural default.

defaulted.  Petitioner cannot show cause for this procedural default because he did

claim on appeal that counsel should have called Nekiya Chase as a witness and does

not allege that he was unaware of the statement that she gave to police.  Because

petitioner cannot show cause, the court need not reach prejudice.  Petitioner also has

not shown actual innocence to excuse the default, and to the extent that petitioner

asserts a separate claim regarding the admission of Nekiya Chase's statement, it may

be dismissed.[31]

### 2.      Failure to Charge Sergeant Clinton with Perjury

Petitioner concedes that he never raised this claim in any state court, rendering

the claim unexhausted. (Pet. at ¶ 13; Dkt. No. 1 at 12).  Petitioner cannot return to

state court to raise the claim, triggering the procedural default analysis.  Petitioner's

reason for failing to raise this claim on appeal is that the Appellate Division allowed

---

[31] The court will consider petitioner's claim that counsel was ineffective in failing to call
Nekiya Chase as a witness, a claim that is exhausted, and the consideration of which will actually
dispose of both of petitioner's arguments.  It is unlikely that petitioner's second "claim"
regarding Nekiya Chase's statement to the police would have survived as a separate claim in any
event.  Presumably if counsel had called Nekiya Chase as a witness at trial, he could have asked
her about her statement to the police, and if he did not call Ms. Chase as a witness, her statement
would not have been admissible as evidence.  An out-of-court statement offered for the truth of
the matter asserted in that statement is inadmissible hearsay. *See Morales v. Portuondo*, 154 F.
Supp. 2d 706, 723 (S.D.N.Y. 2001); *People v. Nieves*, 67 N.Y.2d 125, 131, 492 N.Y.S.2d 109,
112 (1986) (citation omitted).  There are various exceptions to the hearsay rule, but petitioner
does not argue that any of them apply in this case.  New York does not have a "residual"
exception to the hearsay rule, similar to FED. R. EVID. 807, however, New York does recognize a
"constitutionally based exception" to the hearsay rule for ceratin evidence offered by defendants,
when that evidence provides "circumstantial guarantees of trustworthiness." *Espinal v. Bennett*,
588 F. Supp. 2d 388, 410 (E.D.N.Y. 2008) (citations omitted).  One of the requirements for
admission of evidence under this exception is that the declarant is "unavailable." *Morales*, 154 F.
Supp. 2d at 725 (citing *People v. Robinson*, 89 N.Y.2d 648, 657 N.Y.S.2d 575, 579-81, 679
N.E.2d 1055 (1997)).  There is no indication that Ms. Chase was unavailable, and this fact would
have made the exception inapplicable to petitioner's case.

petitioner a limited amount of pages for his *pro se* supplemental brief, and petitioner was "forced to take it out." *Id.*  This explanation does not rise to the level of "cause." The court notes that petitioner's brief to the Appellate Division is sixty pages long and includes the claim that the court should have granted a mistrial based on false testimony by the informant, which is related to Sergeant Clinton's alleged "perjury." (*Pro Se* Br. at 36-39; Dkt. No. 15-3 at 38-41).  In his *pro se* brief, petitioner discussed the officer's testimony, but never claimed that the court should have charged the officer with perjury.  Thus, petitioner has stated no cause for his failure to include this claim in his direct appeal, and the claim may be dismissed.

### 3.    Failure to Raise Claims in Constitutional Terms

The rest of the claims that respondent argues are unexhausted all involve some kind of instruction that petitioner believes should have been given by the court, or in one instance, by the prosecutor during the grand jury proceedings.  Petitioner raised all four claims in state court, either through counsel or in petitioner's *pro se* brief.  In state court, petitioner raised all four claims, citing predominantly state law.  He stated at the beginning of his *pro se* brief that the Government's conduct was so egregious as to "constitute a violation of the due process clause of the New York State Constitution." (*Pro Se* Br. at 12; Dkt. No. 15-3 at 14).

At the beginning of his federal petition, petitioner generally states that he was "denied his Constitutionally protected rights to due process, and the right to a fair and impartial trial." (Pet. at 1; Dkt. No. 1 at 2).  This court will assume that petitioner is attempting to raise all of his claims in this petition under the federal constitution.

27

Thus, the court will analyze the above four claims as if petitioner is now raising the grounds as alleged violations of federal law.

### i.      Prosecutor's Grand Jury Instruction

In petitioner's *pro se* supplemental brief to the Appellate Division, he alleged that the prosecutor should have instructed the grand jury on an agency defense, "because it is conceivable that the grand jury may have chosen to indict on a lesser ground of possession." (*Pro se* Br. at 27).  Petitioner cited one New York Appellate Division case[32] in support of his argument, but cited no federal constitutional provisions or cases whose decisions were based on federal constitutional principles.  Because a state criminal defendant has no federal constitutional right to be charged by a grand jury, irregularities in grand jury proceedings are not cognizable in a federal habeas corpus petition. *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989).  Thus, raising a claim that challenges procedures before the grand jury does not "automatically" bring to mind a right protected by the federal constitution.  Petitioner has failed to exhaust the federal constitutional basis for his grand jury claim.  Petitioner cannot return to state court to challenge the prosecutor's conduct before the grand jury, thus, the claim is procedurally barred.  Petitioner has shown no cause or prejudice, and as stated above, the claim would not be cognizable in any event.  Thus, petitioner's grand jury instruction claim may be dismissed.[33]

---

[32] *People v. Jenkins*, 157 A.D.2d 854, 550 N.Y.S.2d 736 (2d Dep't 1990).

[33] The court would also point out that prior to trial, petitioner's counsel made a motion to dismiss the indictment based upon the prosecutor's failure to instruct the grand jury as to the agency defense. (T. 13-14).  The court denied the motion, holding that the District Attorney was under no

### ii.     Jury Instructions

On appeal, petitioner's counsel challenged the court's failure to instruct the petit jury on the agency defense, and petitioner's *pro se* brief challenged the court's failure to instruct the jury on the entrapment defense on the fourth degree possession charge.  The Appellate Division denied both claims on the merits. *People v. Hunt*, 50 A.D.2d at 1247-48.  Although petitioner's counsel raised the agency charge claim, essentially as a matter of state law, at the end of the argument, counsel stated that the failure of the court to charge the agency defense denied petitioner "his due process right to present his defense and have the jury determine his guilt or innocence . . . ." (Pet. Br. at 29-33, 33; Dkt. No. 15-1).

Generally, challenges to jury instructions involve errors of state law. *See Tucker v. Bennett*, 219 F. Supp. 2d 260, 269 (E.D.N.Y. 2002).  Thus, raising only a claim that a jury instruction was improper under state law will not always alert the state court to a federal constitutional issue.  As stated above, an exception to this rule applies when the state court must necessarily reject the federal claim in order to decide the state law issue. *Jackson v. Edwards*, 404 F.3d 612, 620-21 (2d Cir. 2005).  In *Jackson*, the Second Circuit decided a question left open by the Supreme Court in *Baldwin v. Reese*, 541 U.S. 27 (2004), and held that a petitioner "necessarily" presents a federal claim when the state and federal claims share the same standard. *Id.*  In *Jackson*,

---

obligation to charge a grand jury as to every conceivable defense, suggested by the evidence. (T. 14). The court stated that a review of the grand jury minutes showed that the petitioner testified before the grand jury, stating that he was the victim of entrapment, and the prosecutor did charge the grand jury as to the defense of entrapment. (T. 13-14).  The court found that the additional instruction on agency was not warranted. (T. 14).

petitioner's Appellate Division brief relied only upon state law in arguing that the court should have given a justification charge. *Jackson*, 404 F.3d at 620.  The Second Circuit held, that if Jackson had argued that the trial court's failure to include a charge on the justification defense denied him due process under the Fourteenth Amendment, the Appellate Division's inquiry would have been the same. *Id.* at 621.  Because the standard would have been the same whether the court was considering the state or the federal issue, the state court necessarily decided the federal claim at the same time it considered the state law argument, and the federal claim would have been exhausted. *Id.* at 621.

In this case, the court notes that in addition to raising a state law challenge to the court's failure to give an agency charge, Mr. Hunt's appellate counsel added a sentence regarding the denial of petitioner's "due process"[34] right to present a defense. (Pet. Brief at 33; Dkt. No. 15-1; Resp. Ex. A). Under New York law, agency is a defense to the criminal sale charge. *See e.g. People v. LaVoie*, 304 A.D.2d 857, 757 N.Y.S.2d 616 (3d Dep't 2003) (agency is not an affirmative defense, but rather "may negate the existence of an essential element of the sale crime).  The Appellate Division decided the issue on the merits in this case as they did in *Jackson* by stating that no reasonable view of the evidence would have supported the agency defense.

---

[34] Vague references to due process alone have been held insufficient to exhaust a constitutional claim in state court. *See Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988) (mere reference to "constitutional rights" did not alert the state court to a confrontation clause issue); *Petrucelli v. Coombe*, 735 F.2d 684, 687 (2d Cir. 1984) (vague reference to a denial of fair trial and due process in conjunction with the introduction of certain evidence did not alert the state court to a federal double jeopardy claim).

*Compare* 50 A.D.2d at 1248 *with Jackson*, 404 F.3d at 617.

In this case, by raising the court's failure to instruct the jury on the agency defense, counsel argued that petitioner did not have the opportunity to present a defense that could have exonerated him on the sale charge, a defense that the prosecution would have to disprove beyond a reasonable doubt.  Based on *Jackson* and counsel's language at the end of his jury instruction argument, this court finds that petitioner's agency instruction claim is exhausted, and the court may proceed to consider the merits.

Counsel did not raise the claim regarding the entrapment instruction.  Petitioner raised the entrapment charge claim in his *pro se* supplemental brief. (Pet. Br. at 40-42; Dkt. No. 15-3 at 42-44).  Petitioner raised this claim in the context of state law, and argued that the failure to give the instruction denied petitioner "a fair trial." *Id.* at 41. The court notes that petitioner is raising this challenge only with respect to the Fourth Degree Possession charge because the court did give the entrapment instruction in relation to the sale charge.

In his *pro se* brief, petitioner argued that the trial judge's failure to give an entrapment charge on the possession count, after he gave an entrapment charge on the sale count "undermined" petitioner's defense. (Pet. Supp. Brief at 41; Dkt. No. 15-3 at 43; Resp. Ex. C).  Petitioner argued that because the court gave an entrapment charge on the sale count, but not on the possession count, the court "conveyed to the jury that it considered the defendant guilty on that count." *Id.*  Although this court doubts whether this particular claim is exhausted, petitioner's allegations may be read as

31

raising the same claim raised by counsel, that the court deprived petitioner of his ability to present a defense.  The court will consider the claim exhausted and reach the merits.[35]

### iii.    Jury Questions

Petitioner raised this issue in his *pro se* brief. (*Pro Se* Br. at 44-48; Dkt. No. 15-3 at 46-50; Resp. Ex. C).  Petitioner claimed that the court erred when it failed to properly re-define the terms: "predisposition, preponderance of the evidence, and active inducement" after the jury sent the judge a note requesting clarification of those terms. *Id.* at 45.  Although petitioner cited some federal cases,[36] he claimed that the trial judge erred under section 310.30 of the New York Criminal Procedure Law.  This section provides that the jury may request further information or instruction from the court at any time during deliberations. N.Y. CRIM. PROC. LAW § 310.30.  Petitioner argued that the trial judge erred when he failed to give the jury proper information

---

[35] If this court found the claim unexhausted, petitioner would be unable to return to state court because he has already raised the state claim on appeal, and any motion to vacate would be denied because petitioner unjustifiably failed to raise the claim on appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c).  Whether the court finds procedural default or whether the court considers the merits, the claim must be dismissed.

[36] Petitioner cited *United States v. Salliey*, 360 F.2d 699 (4th Cir. 1966).  *Salliey* involved a federal criminal case, and the issue involved jury instructions on essential elements of the crime, not the elements of an affirmative defense. *Id.* at 702.  No constitutional issues were raised.  Petitioner also cited *United States v. Jacobs*, 413 F.2d 1105 (D.C. Cir. 1969).  The court in *Jacobs* stated that the jury should not be told to "consider the evidence in light of their own experiences as citizens of the community." *Id.* at 1106.  However, the court held that because there was no objection, the error, although deemed "plain," did not affect the appellant's substantial rights. *Id.* at 1105.  The case did not involve a situation where a previous instruction had been given, and there was no constitutional analysis.  Finally, the court would point out that the burden of showing the constitutional invalidity of a state court's judgment is greater than the showing required to establish plain error on direct appeal. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Thus, citing a case involving plain error on direct appeal does not alert the state court to a federal constitutional issue.

after such a request. (Pro Se Br. at 48).  Petitioner argued that the terms with which the jury was having trouble went to the heart of petitioner's entrapment defense.

This court finds that petitioner's claim regarding the trial court's failure to properly clarify the jury instructions was not raised in federal constitutional terms, and thus, was not exhausted in the state court.  Because petitioner cannot return to state court, the claim is deemed exhausted, but subject to procedural default analysis. Petitioner has not established cause for his default, and there is no indication that he is actually innocent or that a miscarriage of justice will occur if the court does not review this claim on the merits.

## IV.  **Merits**

### A.   **Legal Standards**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling ***on the merits*** of a federal constitutional issue was either "'contrary to . . . clearly established Federal law' or 'involved an unreasonable application . . . of clearly established Federal law.'"  *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)) (alterations in original).[37]  In order to apply this standard under the AEDPA , the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings.  28 U.S.C. § 2254(d)(1).

---

[37] Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact.  *Thompson v. Keohane*, 516 U.S. 99, 107-113 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record.  *Id.*

*See also Day v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds).  Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254 (e)(1).  If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

Petitioner's exhausted claims were all[38] considered on the merits by the Appellate Division, whether explicitly or without analysis.[39]  Thus, this court will proceed to consider the claims raised in petitioner's application on the merits under the AEDPA standard.

### B.     Application

### 1.     Destruction of Evidence

In *California v. Trombetta*, 467 U.S. 479, 485 (1984), the Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, criminal defendants

---

[38] The only claim that the Appellate Division failed to consider on the merits was petitioner's challenge to the trial court's admission of his grand jury testimony, a claim that he does not bring in this petition. *See* 50 A.D.2d at 1248.  The Appellate Division found that this claim was not preserved for its review. *Id.*

[39] The Appellate Division considered petitioner's *Batson* claim explicitly in its decision. 50 A.D.2d at 1246-47.  The Appellate Division also considered petitioner's claim that he was entitled to jury instructions on agency and entrapment. *Id.* at 1248.  Finally, the court stated that "[w]e have examined the other issues raised by defendant and conclude that they are ***meritless***." *Id.* (emphasis added).

34

must be afforded a meaningful opportunity to present a complete defense.  In

*Trombetta*, the Court held that a defendant was entitled to access to evidence, which

also requires defendants to be provided with exculpatory evidence. *Id.*  The Supreme

Court has also held that in order to establish that the destruction of evidence rises to

the level of a constitutional violation, petitioner must establish first, that the

prosecution acted in bad faith in destroying the evidence; second, that the destroyed

evidence was exculpatory; and third, that the evidence was of such a nature that the

petitioner would be unable to obtain comparable evidence by any other reasonably

available means. *Arizona v. Youngblood*, 488 U.S. 51, 56-58 (1988). *See also United*

*States v. Williams*, 205 F.3d 23, 29-30 (2d Cir.), *cert. denied*, 531 U.S. 885 (2000);

*Buie v. Sullivan*, 923 F.2d 10, 11-12 (2d Cir. 1990).  In *Williams*, the Second Circuit

held that the misconduct must have deprived petitioner of a fair trial. *Williams, supra*.

    In this case, petitioner claims that the police destroyed the audiotape that they

had used in an attempt to record the conversation between petitioner and Mr.

Surprenant in the car, at the time of the sale. (T. 357).  At trial, Sergeant Clinton

testified that Investigator Kunzia attempted to record the conversation, but "[t]here

was nothing on the tape." (T. 325).  On cross-examination, Sergeant Clinton stated

that he was sure that there was nothing on the audiotape because they played it twice.

(T. 352, 357).  Investigator Kunzia also testified that nothing had been recorded on the

tape. (T. 374).  Sergeant Clinton stated that, because Sergeant Dupras believed that the

tape was "no good," he started to break it, but Investigator Kunzia stopped him. (T.

353).

Sergeant Dupras also testified that there was nothing on the tape, and that there was something wrong with the tape itself. (T. 463). He stated that he was going to destroy it so that it was not used again accidentally. (T. 463). He testified that he was going to break it in half and discard it, however, he stated that the was "a discussion that [they] probably should keep the tape just for evidence sake. So [they] decided to keep it, in fact, and log it, even though there was nothing on it." (T. 464). Petitioner's counsel took the opportunity to cross-examine Sergeant Dupras thoroughly about the "destruction" of the evidence and whether it was "okay to destroy evidence." (T. 465-68).

The Appellate Division denied petitioner's claim by stating that he failed to demonstrate how he was prejudiced by the "damaged *Rosario*[40] material in light of the testimony that there was nothing recorded on the audiotape in question." 50 A.D.3d at 1248 (footnote added). The issue of the damaged/destroyed tape was thoroughly explored at trial. All the testimony supported the factual finding that there was nothing recorded on the tape. That finding, repeated by the Appellate Division, is entitled to deference under the AEDPA. Petitioner has shown not shown by clear and convincing evidence that the factual determination was incorrect. Based on the finding that there was nothing on the tape, it could not have been exculpatory, and thus, the petitioner would not have been able to succeed on his constitutional claim.

---

[40] *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1981), *cert. denied sub nom*. Rosario v. New York, 368 U.S. 866 (1961). *Rosario* requires prosecutors to provide disclosure of witness statements to the defense prior to trial. *Id.* Generally, *Rosario* violations arise exclusively under state law and are not subject to federal habeas review. *See Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998).

The Appellate Division's decision is thus, not contrary to, nor an unreasonable application, of the *Youngblood* standard, and his claim regarding the destruction of evidence (Claim No. 1) may be dismissed.

### 2.    False Testimony

Six[41] of petitioner's grounds for relief are related to his claim that Mr. Surprenant lied when he stated that he had previously purchased drugs from the petitioner. (Claim Nos. 2-6, 10).  Petitioner also alleges that Sergeant Clinton and the prosecutor lied when they told the court that they found out about this alleged prior sale only days before trial.[42]  Petitioner claims that, not only was this information "false," but it was revealed to petitioner too late for his counsel to properly "prepare" for the admission of the testimony.

A conviction that is obtained through the use of false evidence that is known by the prosecution to be false, is invalid under the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The same is true when the State, although not soliciting the false evidence, allows it to go uncorrected when it appears. *Id.*  The conviction must be set aside if newly discovered evidence shows that the prosecution knew, or should have known, about the perjury, and there is any reasonable likelihood that the false testimony could have affected the jury's judgment. *Dixon v. Conway*,

---

[41] One of those grounds, the court's failure to charge Sergeant Clinton with perjury, is unexhausted and subject to procedural default as stated above, so this court will not reach that issue. (Claim No. 10).

[42] Petitioner points to Mr. Surprenant's testimony that he told the officers and the prosecutor about this incident at the time of Surprenant's grand jury testimony, months before the trial.

613 F. Supp. 2d 330, 389-90 (W.D.N.Y. 2009) (citing *Drake v. Portuondo*, 321 F.3d 328, 345 (2d Cir. 2003)).

In this case, the Appellate Division did not specifically address any of the grounds related to petitioner's claim of "false evidence." Rather, these issues were necessarily included in the "other issues" found by the Appellate Division at the end of its decision to be "without merit." 50 A.D.2d at 1248. Regardless of the lack of specificity in the Appellate Division's opinion, it has been held that an affirmance "without opinion" is still considered "on the merits" for purposes AEDPA deferential review. *Aparicio v. Artuz*, 269 F.3d 78, 92-94 (2d Cir. 2001) (denial of claims without opinion, but without any indication that the denial was on procedural grounds is still "on the merits"); *Sellan v. Kuhlman*, 261 F.3d 303, 311 ("on the merits" does not require the state court to have explained its reasoning process). Thus, this court must apply the AEDPA standard to petitioner's claims.

There are two statements that petitioner claims are "false." First, petitioner claims that Mr. Surprenant's allegation that he had purchased drugs from petitioner prior to the sale in question was false. Petitioner claims that he never sold drugs to Mr. Surprenant, and that this testimony was manufactured to rebut petitioner's entrapment defense. Petitioner also alleges that Sergeant Clinton lied when he stated that he only found out about Mr. Surprenant's statement a few days before the trial so that the prosecutor lacked the information needed to advise defense counsel prior to that date.

Petitioner claims that his attorney found out about this alleged sale too late to

rebut the allegation.  On November 22, 2006, in addition to other pending issues,
counsel and the court discussed the issue of Mr. Surprenant's statement. (Dkt. No. 15-
14 at 85-90).  During a discussion about the entrapment and agency defenses, the
prosecutor stated that he met with the "CI yesterday." (Dkt. No. 15-14 at 85).  He had
not spoken to Mr. Surprenant in a long while, and Mr. Surpenant told the prosecutor,
for the first time that, he previously purchased cocaine from the petitioner. *Id.*

    The prosecutor's conversation with Mr. Surprenant turned to this subject
because defense counsel brought up the defenses of agency and entrapment, and as a
result, the prosecutor asked Mr. Surprenant how he knew petitioner. *Id.*  The
prosecutor stated that he was reporting the conversation to the court because "it's an
uncharged crime, . . . it goes against his . . . defenses of both entrapment and agency."
*Id.*  The prosecutor then stated that he intended to introduce Mr. Surprenant's
statement. *Id.*

    Petitioner's counsel strenuously opposed the admission of Mr. Surprenant's
statement, arguing that it would damage petitioner's defenses and it was his "position
that he's fabricating, that he is beholden to police, . . .  and he's going to say what he
has to say to stay in good graces with them." (Dkt. No. 15-14 at 88).  The court
determined that it would allow the statement "on the same theory that it has allowed
those portions of the grand jury testimony relating to the Defendant's testimony of
prior crimes and bad acts." (Dkt. No. 15-14 at 89-90).  However, the court also
required the prosecutor to submit a written proffer of what Mr. Surprenant's testimony
would be, and wanted to review it "Monday morning first thing." (Dkt. No. 15-14 at

90).  The court stated that after reviewing the statement, "if there are any further objections that are going to be made by [defense counsel], they can be made at that time." *Id*.  The following Monday (Thanksgiving weekend intervened), the parties further discussed this issue with the court. (T. 3) (Dkt. No. 15-15).  Defense counsel argued that he had insufficient time to do "damage control," that petitioner had a different story about how he met Mr. Surprenant, that petitioner did not previously sell Mr. Surprenant cocaine, and that counsel had tried unsuccessfully to locate the individual who could corroborate petitioner's version of the story. (T. 3-4).  Defense counsel then moved to preclude the testimony. (T. 4).  The court denied the motion because counsel had approximately a week to "search this person out." (T. 5).

Although it is clear that petitioner had a different story about how he met Mr. Surprenant, petitioner has cited no evidence to show that the statement by Surprenant was a fabrication.[43]  The entire matter was discussed with the court and at the trial. The issue became one of credibility, and clearly the jury believed the prosecution's version of the story.  Petitioner has not shown either that Mr. Surprenant's testimony was false, or that Sergeant Clinton's testimony was "false."  Petitioner cannot meet the first factor in analyzing a claim of the knowing use of false testimony, and the Appellate Division's rejection of this claim was not contrary to or an unreasonable interpretation of Supreme Court precedent.  Because petitioner cannot establish that the prosecutor knowingly used false evidence, the rest of petitioner's claims, based

---

[43] Petitioner claimed that a friend brought Mr. Surprenant to petitioner's house and they had all smoked crack together.  Petitioner's counsel stated that he could not find this person because she had a "nomadic" lifestyle. (Dkt. No. 15-15 at 3).

upon this allegedly false testimony must fail[44] (Claims 2-6, 10).

### 3.   *Batson* **Challenge**

The Supreme Court has held that a petitioner's equal protection rights under the Fourteenth Amendment have been violated when the prosecutor uses racial discrimination in the exercise of peremptory challenges during jury selection. *Batson v. Kentucky*, 476 U.S. 79 (1986).  When a defendant objects to the prosecutor's use of peremptory challenges, the court uses a three-part test to evaluate the claim. *Johnson v. California*, 545 U.S.162, 168 (2005). The court first determines whether the defendant has established a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. *Id.*  Second, if the defendant has made out a prima facie case, the burden shifts to the State to adequately explain the challenge by offering permissible race-neutral justifications for the strike or strikes. *Id.* If the prosecutor offers a race-neutral explanation, the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. *Id.*

In this case, when petitioner objected to the prosecutor striking the only African American juror on the panel, the trial court determined that petitioner failed to establish a prima facie case of racial discrimination. Thus, the court did not require the prosecutor to come forward with a race-neutral explanation for the strike.  The Appellate Division found, on the merits, that the trial court did not err in making this

---

[44] Petitioner's claims that the court should have granted a mistrial, that the court should have instructed the jury on the informant's credibility, and that the prosecutor should have informed the jury about the informant's credibility also fail as a result.

determination.  Because the Appellate Division decided the issue on the merits, this court must apply the AEDPA standard.

In *Johnson*, the Supreme Court held that the burden of establishing a prima facie may be satisfied by "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." 545 U.S. at 170.  In *Batson*, the court stated that the trial court should consider all relevant circumstances, and provided two examples of situations that might satisfy the movant's burden: (1) a "pattern" of strikes used against black jurors in the petitioner's particular venire, and (2) the prosecutor's questions and statements during voir dire examination and in exercising the challenges. 476 U.S. at 96-97. *See also Jones v. West*, 555 F.3d 90, 97 (2d Cir. 2009) (citations omitted).  The court likened this analysis to that employed in Title VI employment discrimination jurisprudence. *See Overton v. Newton*, 295 F 3d 270, 277-79 (2d Cir. 2002) (discussing prima facie showing under *Batson*); *Truesdale v. Sabourin*, 427 F. Supp. 2d 451, 458-59 (S.D.N.Y. 2006) (discussing *Batson/Johnson* standard).

In *Jones*, the Second Circuit noted that when Jones raised his first *Batson* challenge, he failed to make a prima facie case because

> [a]t that point, the prosecution had used a peremptory challenge against only one of the two black members of the venire that had come up for consideration in the first round, Ms. Jefferson and Ms. Peters, and neither the pattern of strikes nor anything in the prosecutor's recorded statements provided any basis for a prima facie case of discrimination.

555 F.3d at 97 (citing *United States v. Stavroulakis*, 952 F.2d 686, 696 (2d Cir.1992)).

In *Jones v. Conway*, No. 9:05-CV-915, 2008 WL 904899, *9 (N.D.N.Y. March 31, 2008), the court held that although a single instance of discrimination could constitute an equal protection violation, the same basic questions were asked of all the potential jurors, and none of the prosecutor's statements to the jury panel or the other peremptory challenges supported any inference of discrimination.

In this case, the Appellate Division stated that the only reason raised by defense counsel to support discrimination was that the juror was African American and was the only African American in the jury pool. 50 A.D.2d at 1247.  The court stated that petitioner raised no other facts or relevant circumstances that would support an inference of discrimination. *Id.*  As stated above, the fact that the excluded juror was African American, by itself, does not support an inference of discrimination. Petitioner would have to have had more, such as a pattern of strikes against African Americans, or some statements by the prosecutor during voir dire that would indicate a racial basis for the strike.  A review of the voir dire in this case shows that there were no such signs of discrimination in this case.  There was no indication of a discriminatory purpose in the questions asked by the prosecutor, nor was there a "pattern" of strikes.  Thus, petitioner did not set forth a prima facie case of discrimination, and the Appellate Division's decision rejecting petitioner's *Batson* challenge was not contrary to or an unreasonable application of Supreme Court precedent, and petitioner's *Batson* challenge may be dismissed. (Claim No. 11).

### 4.    Jury Instructions on Agency and Entrapment

Petitioner claims that the trial court failed to give an instruction as to the agency

43

and entrapment defenses. The court gave the entrapment instruction as to the criminal

sale charge as well as the possession with intent to sell charge (Counts one and two of

the indictment), but did not give any instructions regarding the agency defense. (T.

883-85).  The court also did not give the entrapment instruction on the "simple

possession" charge.[45] (T. 885-87).  The court specifically told the jury that entrapment

did not apply to the fourth degree possession charge. (T. 887).

As stated above, the adequacy of a state court's jury instructions is generally a

matter of state law, not reviewable in federal court. *Cupp v. Naughton*, 414 U.S. 141,

146 (1973).  When deciding whether the evidence required a certain jury instruction,

deference is afforded to the state court's interpretation of its own law, as long as that

interpretation is constitutional. *Davis v. Strack*, 270 F.3d 111, 123 n.4 (2d Cir. 2001).

Where the claim is failure to give a requested instruction, the petitioner bears an

"especially heavy burden" in showing that the trial court's error violated the federal

constitution. *Rustici v. Phillips*, 497 F. Supp. 2d 452, 470 (E.D.N.Y. 2007) (citations

omitted), *aff'd on other grounds*, 308 Fed. Appx. 467 (2d Cir. 2009).

The failure to charge the jury on an appropriate defense may result in the

_____

[45] The third count of petitioner's indictment charged Criminal Possession of a Controlled
Substance in the Fourth Degree in violation of N.Y. Penal Law § 220.09(1).  (Dkt. No. 15-2 at 9).
Section 220.09(1) provides that

> A person is guilty of criminal possession of a controlled substance in
> the fourth degree when he knowingly and unlawfully possesses:
> (1) one or more preparations, compounds, mixtures or substances
> containing a narcotic drug and said preparations, compounds, mixtures
> or substances are of an aggregate weight of one-eighth ounce or more[.]

The indictment stated that the defendant knowingly and unlawfully possessed cocaine, weighing one-
eighth of an ounce or more. (Dkt. No. 15-2 at 9).

deprivation of due process if the refusal was "sufficiently harmful to make the conviction unfair." *Id.* (quoting *Jackson v. Edwards*, 404 F.3d at 624) (internal quotation marks omitted).  Before the court may grant habeas relief on such a claim, three questions must be resolved in the petitioner's favor:

> (1) was the petitioner entitled to the omitted charge under state law?; if so, (2) did the trial court's failure to deliver that charge result in a denial of due process; and if so, (3) did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?

*Id.* (citing *Jackson*, 404 F.3d at 621).  In this case, the Appellate Division found that the trial court's refusal to charge the jury regarding agency and the trial court's refusal to charge entrapment on the fourth degree possession charge were proper under state law. 50 A.D.3d at 1247-48.

The Appellate Division cited *People v. Magee*, 263 A.D.2d 763, 765 (3d Dep't 1999) (quoting *People v. Ortiz*, 76 N.Y.2d 446, 449 (1990)) for the proposition that under New York law, an agency defense must be submitted to the jury if "any reasonable view of the evidence, considered in the light most favorable to the defendant, supports the conclusion that the defendant was acting solely on behalf of the buyer such that he was "a mere extension or instrumentality of the buyer." 50 A.D.3d at 1247.  Citing *Ortiz*, the court in *Banks v. Conway* stated that this defense reflects the concept that, because there are some cases where the defendant's "mere delivery" of drugs does not involve the same degree of culpability or warrant the harsher penalties associated with sale, the agency defense exists to prevent a sale conviction for one who acts solely as the agent of the buyer. *Banks v. Conway*, No. 09

45

Civ. 4517, 2009 WL 5103123 at *7 (S.D.N.Y. Dec. 17, 2009).

A review of the evidence in petitioner's case shows that no reasonable view of the evidence would have supported the conclusion that petitioner acted "solely" as the agent of the buyer.  The testimony showed that petitioner found the drugs for Mr. Surprenant, delivered the drugs, and negotiated the price when Mr. Surprenant did not believe that the drugs were worth the amount agreed upon.  Petitioner also admitted that he made a profit from the transaction, although he later attempted to distinguish making a profit by stating that got money for his birthday.  This court finds that the trial court was correct in refusing to give an agency instruction. Thus, petitioner cannot show that he was entitled to the instruction under state law, and thus, cannot meet the first requirement of the standard.  Petitioner's claim regarding the agency instruction must be dismissed.

The same is true for the entrapment defense.  The court gave an entrapment instruction on the sale charge and the possession with intent to sell charge, but declined to give the instruction for the fourth degree possession charge.  Under New York law, the entrapment defense requires a showing that the proscribed conduct was "induced" or encouraged by official activity and that the defendant had no predisposition to engage in the conduct. *Vega v. Walsh*, 258 Fed. Appx. at 358 (citing *People v. Butts*, 72 N.Y.2d 746, 536 N.Y.S.2d 730, 533 N.E.2d 660, 663 (1988) (quoting N.Y. Penal Law § 40.05).  Where no reasonable view of the evidence would allow a reasonable jury to find that the statutory requirements of entrapment were satisfied, the defendant is not entitled to the instruction. *Id.* (citing *People v. Brown*,

82 N.Y.2d 869, 609 N.Y.S.2d 164, 631 N.E.2d 106, 107 (1993)).

In this case, under any view of the evidence, petitioner was not entitled to the entrapment instruction on the fourth degree possession charge.  Petitioner does not deny possessing the drugs or delivering them to Mr. Surprenant.  Given the petitioner's admission that he was a drug addict and regularly invited people to his house to smoke crack, it is impossible to believe that he was not predisposed to possessing drugs as opposed to selling drugs.[46]  Thus, the trial court was correct in refusing to give the entrapment instruction on the simple possession charge, and petitioner cannot meet the first requirement of his federal claim.  The Appellate Division's decision was not contrary to or an unreasonable application of Supreme Court precedent, and petitioner's claims may be dismissed. (Claim Nos. 8, 9).

### 5.    Entrapment

The petition contains one ground, separate from petitioner's jury instruction claims, that simply states that petitioner was "entrapped" into committing the offenses charged. (Claim No. 13).  This court will interpret this claim as raising an argument that the evidence was insufficient to convict petitioner.  Petitioner's counsel raised a sufficiency and weight[47] of the evidence claim on appeal, and thus, exhausted the

---

[46] Petitioner confuses the concepts of sale and possession.  Petitioner believes that the court's failure to give the entrapment instruction on the possession charge somehow undermined his entire case.  However, the issue of predisposition to commit the crime is quite clear on the possession charge, and thus, the court's distinction was proper.

[47]  Under New York State law, the two claims are related, but have distinctly different standards. *See People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987).  A claim that the verdict is against the "***weight of the evidence***" is a purely state law claim, based upon N.Y. CRIM. PROC. LAW § 470.15, whereas a ***legal sufficiency*** claim is based upon federal

47

claim.  The Appellate Division did not specifically address sufficiency or weight of the evidence, and this court must assume that these arguments were among those that the Appellate Division considered "without merit."  The court, therefore, addresses the federal constitutional claim under the AEDPA standard.

The petitioner has a heavy burden in a legal sufficiency of evidence claim. *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996).  The well-established Supreme Court precedent provides that a court must determine whether any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1970)).  The evidence must be viewed in the ***light most favorable to the prosecution****. Id.*  Issues of credibility are for the jury to resolve. *Vera v. Hanslmaier*, 928 F. Supp. at 284 (citation omitted).  Under federal standards, a conviction may also be based on circumstantial evidence "so long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994).  Finally, under New York law, although "agency" is a complete defense to a sale charge[48] that the government must disprove, entrapment is an affirmative defense that the petitioner was required to prove. *See People v. Lavoie*, 304 A.D.2d at 857 (agency is not an affirmative defense,

---

constitutional principles. *See Garbez v. Greiner*, 01 Civ. 9865, 2002 U.S. Dist. LEXIS 13806, *24-25 (S.D.N.Y. July 30, 2002) (citing *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)).  Counsel mentioned both weight and sufficiency in his appellate brief. (Pet. Br. at 41-43; Dkt. No. 15-1; Resp. Ex. A).

[48] Although agency is a defense to the sale charge, the defendant may still be guilty of possession. *See People v. Chong*, 45 N.Y.2d 64, 74, 407 N.Y.S.2d 674, 379 N.E.2d 200 (1978)).

but rather may negate the existence of an essential element of sale), *cited in Burden v. Filion*, 421 F. Supp. 2d 581, 585 (W.D.N.Y. 2006) (citations omitted). *See also* N.Y. Penal Law § 25.00(2), 40.05 (entrapment is an affirmative defense).

A review of the evidence shows that, viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to convict petitioner on all counts, that he was not the agent of the buyer, and that he was not "entrapped" into committing the charged offenses. Essentially, petitioner appears to believe that if he did not "sell"[49] drugs on a regular basis, he could not be convicted of sale because he was just doing Mr. Surprenant a favor (agency defense). Alternatively, petitioner believes that if he did "sell" the drugs to Mr. Surprenant, it was only because Mr. Surprenant called petitioner so many times at the behest of law enforcement, that petitioner was "entrapped" into committing a crime that he had no propensity to commit (entrapment defense).

The fact that Mr. Surprenant initiated the purchase or encouraged petitioner to help him find drugs does not make petitioner Mr. Surprenant's agent. Under New York law, a person may be found guilty of selling drugs when he gives them to another even though he has received nothing in return. N.Y. Penal Law § 220.00. During petitioner's own testimony, first, he stated that Mr. Surprenant asked petitioner

---

[49] Under New York law, to establish petitioner's guilt of Criminal Sale of a Controlled Substance, Third Degree, the prosecution must prove that petitioner knowingly and unlawfully sold a narcotic drug. N.Y. Penal Law § 220.39(1). To establish petitioner's guilt of Criminal Possession of a Controlled Substance, Third Degree, the prosecution must prove that petitioner knowingly and unlawfully possessed a narcotic drug with intent to sell. *Id.* § 220.16(1). Sale is defined as exchanging, giving or disposing of the drugs to another, or to offer or agree to do so. *Id.* § 220.00(1).

and Nekiya Chase to "do [him] a favor," and said that "you guys can make a couple of hundred dollars off the deal." (T. 664). Petitioner then testified that he called "J" and explained that a friend had $1500.00 and wanted to purchase some crack. (T. 668; Dkt. No. 15-21). Petitioner testified that when "J" brought the drugs to petitioner, "J" "gave [petitioner] the drugs and left, and he said, 'Call me when you return with my $1200.'" (T. 671). Shortly thereafter, petitioner admitted that he wanted to get a "little something" for himself and thought he "'could make an easy hundred bucks.'" (T. 675). On cross-examination, the prosecutor asked petitioner whether as far as he knew when he drove to Waterford, "the deal was going to be $1500 . . . ." (T. 700). Petitioner stated that Mr. Surprenant "had $1500, and that I could make a couple of hundred dollars off of the deal." *Id.*

When Mr. Surprenant refused to give petitioner the $1500.00, petitioner took $1300, and the prosecutor asked whether petitioner "negotiated that on [his] own." (T. 702). Petitioner responded that "anything from 12- to 15- is mine . . . , and I was hoping to get the extra money." *Id.* Petitioner stated that he "was expecting to profit by $300. I owed – I owed J $1200, and after that everything else is gravy." *Id.* He stated that when Mr. Surprenant complained about the quantity of drugs, and petitioner agreed to take $1300.00, he stated that he was not going to argue with Surprenant because "I was still going to get a hundred dollars out of it. . . ." (T. 703). If he could not "get drugs, yes, I get money to buy drugs." (T. 704). Petitioner also testified that when Nekiya called someone to bring drugs to petitioner's house, "they give her a little more. . . . – it was better for **us** to have Nekiya call someone, because

*we would get a little something extra out of it*." (T. 709) (emphasis added).

The agency defense arises from the concept that there are certain cases where the defendant's mere delivery of drugs does not involve the same degree of culpability or warrant the same penalties associated with selling drugs. *People v. Chong*, 45 N.Y.2d at 75. One of the factors in the agency defense in New York is whether the defendant profited or stood to profit from the transaction. *See People v. Ortiz*, 76 N.Y.2d 446, 450, 560 N.Y.S.2d 186, 560 N.E.2d 162 (1990) (citing *People v. Chong*, 45 N.Y.2d at 75). In *People v. Chong*, the court held that while receipt of "some incidental benefit" might not be enough to show that the defendant was the buyer's "agent," a "substantial reward promised in advance" may be sufficient. 45 N.Y.2d at 75.

In this case, based upon petitioner's own testimony, he intended to profit from the beginning. He repeated several times that he intended to make three hundred dollars from the deal, and then when Mr. Surprenant balked at paying the entire $1500, petitioner simply reduced the price to $1300.00, without consulting the alleged "seller," because petitioner knew that "J" only needed to get $1200.00 back. He testified that he and Nekiya Chase would call drug dealers to bring drugs to petitioner's house, where he would allow the individual to sell drugs to petitioner's friends. In fact, petitioner testified that Mr. Surprenant had been to petitioner's house several times to purchase crack, albeit not directly from petitioner.[50] (T. 711-12).

---

[50] Petitioner claims that Mr. Surprenant's statement that he previously purchased drugs from petitioner was "false," and that the court or the prosecutor should have said something specifically about Mr. Surprenant's credibility. Mr. Surprenant testified that one night, when he was on a

With respect to petitioner's propensity to commit the crime, petitioner's own testimony showed that he was a cocaine addict, possessed drugs, and often asked individuals to come to his house to sell drugs to others.  In order to establish entrapment under New York law, petitioner must prove by a preponderance of the evidence that he was actively induced or encouraged to commit the offense by a public official, and this inducement or encouragement created a substantial risk that the offense would be committed by an individual that was not otherwise predisposed to do so. *People v. Brown*, 82 N.Y.2d 869, 871, 609 N.Y.S.2d 164, 631 N.E.2d 106 (1993) (citing *inter alia* N.Y. Penal Law § 40.05).

The court must point out, as stated above, that the trial court did instruct the jury on the defense of entrapment for the sale charge as well as the possession with intent to sell.  Based on all the evidence presented, including petitioner's own testimony that he frequently brought drug sellers into his home to sell drugs to friends and that he frequently received some sort of benefit from these "transactions," the issue came down to credibility, and the jury chose to believe the prosecution's version of the incident.  There was constitutionally sufficient evidence to find petitioner guilty

---

"binge," and driving around, petitioner flagged him down to offer him drugs. (T. 407).  Petitioner testified that a friend of his brought Mr. Surprenant to petitioner's house.  Surprenant stated that he purchased $800 to $1000 of cocaine on one day from petitioner in December 2005 or January of 2006, and that it was the first time he ever met petitioner. (T. 407-408 (direct examination) 420-21 (cross-examination)).  On cross-examination, Mr. Surprenant testified that he waited in one room while petitioner went into another room and came back with the drugs. (T. 422).  Petitioner testified that Mr. Surprenant came to petitioner's house to obtain drugs seven or eight times prior to the sale in question, but that someone else brought the drugs to petitioner's house to sell Surprenant. (T. 711-12).  While these statements are "inconsistent," and it was up to the jury to determine who and what was credible, there was no reason for the judge make specific mention of the "informant's credibility."

of both sale and possession of the drugs.  Thus, the Appellate Division did not act

contrary to Supreme Court precedent in summarily denying petitioner's sufficiency of

evidence claim.

### 6.        Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel was ineffective for a variety of reasons.

As discussed above, petitioner raised all but two of these bases in his supplemental

*pro se* brief.  The Appellate Division denied these claims without opinion as "without

merit." 50 A.D.3d at 1248.  Because the Appellate Division decided the issues on the

merits, the AEDPA standard is applicable.

The standard for ineffective assistance of counsel was articulated in *Strickland*

*v. Washington*, 466 U.S. 668, 687-96 (1984)..  This test requires an affirmative

showing that counsel's performance fell below an objective standard of

reasonableness and that prejudice resulted because there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. *Id.* at 694. *See also Mickens v. Taylor*, 535 U.S. 162, 166 (2002).  In

*Strickland*, the Supreme Court stated that "there are countless ways to provide

effective assistance in a given case," and that "even the best criminal defense attorneys

would not defend the particular client the same way." 466 U.S. at 689 (citation

omitted).  When assessing counsel's performance, courts "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Id.*  Courts should not use hindsight to second-guess sound

tactical decisions made by attorneys. *Id. See also Mason v. Scully*, 16 F.3d 38, 42 (2d

Cir. 1994) (acts or omissions by counsel that may be considered sound trial strategy do not constitute ineffective assistance of counsel).

In this case, counsel had a difficult situation with which to work. Petitioner clearly engaged in the charged conduct. There is no question that petitioner obtained drugs for Mr. Surprenant, delivered the drugs to Mr. Surprenant, and made a profit from the sale of those drugs. Counsel made a motion to dismiss prior to trial, motions to dismiss during trial, and did his best to discredit Mr. Surprenant's testimony. When he was informed about Mr. Surprenant's claim that he had previously purchased drugs from petitioner, counsel participated in a hearing to address the suppression of the statement, and made a motion to dismiss the case at the close of the prosecution's case. Counsel also did his best to discredit the prosecution's police witnesses, focusing on their alleged "destruction" of evidence and Sergeant Clinton's alleged inconsistent testimony about when he learned of petitioner's prior "sale" to Surprenant.

### i.      Telephone Call to Petitioner

Petitioner faults counsel for revealing to the prosecutor that Mr. Surprenant allegedly called petitioner two weeks after petitioner's arrest to apologize for the police because what "they" did was wrong. Petitioner did not actually speak with Mr. Surprenant, rather, petitioner claims that this "message" was left on petitioner's answering machine. Petitioner alleges that counsel should not have mentioned this to the prosecutor because counsel should have surprised Mr. Surprenant with this information at trial. Apparently, however, this "message" was somehow erased

because of a power surge at petitioner's home. (Pet. Supp. Br. at 49-50).  Petitioner has not indicated how this alleged error, even assuming it was an error that fell below an objective standard of reasonableness, would have changed anything at trial.

Prior to the beginning of petitioner's case, the prosecutor stated that he wanted an offer of proof with respect to petitioner's wife Deidre Turner, who defense counsel intended to call as a witness. (T. 551; Dkt. No. 15-20).  The prosecutor thought that defense counsel was going to call Ms. Turner to testify regarding the alleged telephone message, and wanted to preclude any such testimony as hearsay. (T. 511). Defense counsel argued that, to avoid the hearsay problem, he was going to call Surprenant himself to ask about the telephone call. (T. 512).  The court allowed defense counsel to call both individuals as witnesses.  Mr. Surprenant testified that he called petitioner "by mistake" and denied leaving a message on petitioner's answering machine, because Surprenant realized that he had called the wrong number. (T. 550). Deirdre Turner was allowed to testify to the entire content of the message that Mr. Surprenant allegedly left on the answering machine.[51] (T. 610).  Thus, the jury was allowed to hear the testimony.  It is unclear how petitioner could claim that defense counsel was ineffective because he informed the prosecutor of defense counsel's intention to introduce this evidence.

###    ii.    "Referencing" Another Defendant's Case

Petitioner makes a vague claim that counsel undermined petitioner's motion for

---

[51] The prosecutor objected, but the court found that the statement was not being offered to prove the truth of the matter asserted. (T. 610).

dismissal when he referenced another defendant's case.  Petitioner included this "argument" in his *pro se* supplemental brief to the Appellate Division in the context of arguing that defense counsel filed an unsuccessful pretrial motion for dismissal. (Pet. Supp. Br. at 50-52).  Petitioner apparently believes that counsel's motion somehow prejudiced petitioner in the judge's eyes.  Because there was no question that petitioner delivered the drugs to Mr. Surprenant, the success of a pretrial motion to dismiss was questionable, and petitioner's argument that a case citation by his attorney in that motion rose to the level of ineffective assistance of counsel is simply without merit.

### iii.    Failure to Call Nekiya Chase

Petitioner asserts that counsel was ineffective in failing to call Nekiya Chase as a witness because she would have supported petitioner's claim that he was not a "drug dealer."  Counsel's decision not to call Ms. Chase as a witness is no more than a tactical decision.  Respondent has included Nekiya Chase's statement as Exhibit D. (Dkt. No. 15-4 at 8-9).  Her statement is inconsistent with petitioner's testimony. During his testimony, petitioner stated that Ms. Chase was the one who knew the drug dealers and who called them to bring drugs to petitioner's house. (T. 658-659).  Ms. Chase stated that she had previously purchased drugs from "J," but did not state that she was the individual who made calls for other people, including Mr. Surprenant. (Resp. Ex. D at 8-9).

Ms. Chase also told police that "J" (the drug "dealer') was actually Jamel Patterson. *Id.*  Petitioner was very specific during his testimony that "J" and Jamel

were not the same person and that "J" was a dealer. *Compare* T. 668 *with* T. 670.

Petitioner testified that although he asked "J" to give him a ride to Waterford, "["J"]

said he had other things to take care of, and he couldn't drive me." (T. 670).

Petitioner then stated that, instead, he got a ride from Jamel Patterson, who was a "pot

dealer," but not a crack dealer. (T. 670).  "J" only brought petitioner the drugs and left.

(T. 671).  Thus, petitioner's testimony was inconsistent with Nekiya Chase's

statement, and could have harmed his credibility, rather than helped him to show that

he was not a "drug dealer."  Thus, counsel's failure to call Nekiya Chase as a witness

did not fall below an objective standard of reasonableness.

### iv.    Miscellaneous Claimed Errors by Counsel

Petitioner includes a variety of miscellaneous errors allegedly committed by

counsel.  Petitioner claims that counsel was ineffective because he failed to call an

"expert" to testify about addiction.  Petitioner claimed that if the jury understood

petitioner's "addiction," it would have given them "a workable knowledge of the

defendant." (Pet. Supp. Br. at 56-57).  There was no question that petitioner was a

drug addict, and petitioner merely implies in a conclusory fashion that an "expert" on

addition would have helped the jury understand petitioner's state of mind when Mr.

Surprenant was allegedly coercing plaintiff to undertake the sale.  Petitioner seems to

be arguing that if he had an expert testify, he or she would have convinced the jury

that petitioner's will was overcome by Mr. Surprenant's continuing telephone calls,

and the jury would have believed petitioner's defense of entrapment.  Petitioner,

however, has provided absolutely no support for this conclusory allegation.  Petitioner

bears the burden of proof in habeas proceedings. *See Miller-El v. Cockrell*, 537 U.S. 322, 358 n.3 (2003) (noting the petitioner's burden of proof).

Petitioner also claims that trial counsel failed to produce a "partially audible" tape, containing a conversation between Mr. Surprenant and petitioner that allegedly took place at petitioner's home. (Pet. Supp. Br. at 57-58).  Petitioner claims that this "partially audible" tape should have been introduced to "refute" the police testimony that both tape recordings were "completely inaudible." *Id.*  Sergeant Clinton clarified on cross-examination that there were two audio tapes, one of which was destroyed. (T. 347-48; Dkt. No. 18).  Sergeant Clinton also testified that he did not believe that there was anything audible on the second tape, but he "couldn't be sure" if there were any "bits and pieces" on it. (T. 335).  He could not "make out anything on it." (T. 335). Counsel focused upon the tape that was destroyed in order to discredit the police testimony, although he did bring up the second tape.  It is unclear what petitioner claims would have happened, and it is also unclear to what tape he is referring since defense exhibits included three audiotapes. (T. 348).  There was absolutely no reason to introduce the second tape to "further" discredit the officer's testimony.  For the defendant, the important point was that the police had destroyed one tape, leaving the jury to believe that perhaps something exculpatory might have been on that tape.

Petitioner claims that counsel erred in failing to inform the jury in any way about the "prosecutions [sic] credibility issues." (Pet. at 19).  It is unclear to what petitioner is referring since counsel's entire case revolved around the lack of credibility of the prosecution's witnesses, including Mr. Surprenant and the police.

Petitioner claims that counsel told the trial judge during a charge conference that petitioner was a "drug dealer."  Counsel never called the petitioner a drug dealer during the charge conference.  (T. 54-59).  Petitioner has misquoted his attorney's statement and has taken the quote out of context.  Counsel was telling the court what he thought the prosecution was going to argue, and counsel was asking the judge to charge entrapment on all counts. (T. 753-59).  Counsel specifically stated that petitioner "is not a dealer.  He doesn't have large amounts, he is not a dealer." (T. 757).  Thus, petitioner's claim is completely unsupported by the transcript.

Petitioner complains that counsel's summation was "a plea to convict petitioner."  A review of counsel's summation shows that it was completely appropriate and focused upon petitioner's claim that Mr. Surprenant was unworthy of belief (T. 811-14) and that petitioner was entrapped into providing drugs to Mr. Surprenant. Counsel also mentioned the fact that the police "submarined and sabotaged this case" when they destroyed the microcassette tape evidence so the jury would never know whether there was any exculpatory conversation on it. (T. 804-810).

Defense counsel did what he could with the facts of the case.  It was clear that petitioner had obtained drugs for Mr. Surprenant.  Petitioner complains that counsel painted him in a bad light, but in order to establish the defense that petitioner wished to present, counsel had to portray petitioner as a hapless drug addict, who had no "predisposition" to sell drugs and whose will was overcome by his addiction and by the police informant's constant insistence.  Counsel did not act unreasonably in doing

59

so.  Thus, the Appellate Division did not act contrary to *Strickland* when it failed to overturn petitioner's conviction due to alleged ineffective assistance of trial counsel.

### 7.    Combination of Errors

Finally, petitioner alleges that the combination of errors denied him a fair trial. In some circumstances, cumulative errors may "serve as the basis for habeas corpus relief." *Brumfield v. Stinson*, 297 F. Supp. 2d 607, 621 (W.D.N.Y.2003) (Report and Recommendation of Foschio, M.J., adopted by Elfvin, D.J.) (citing Sanders v. Sullivan, 701 F. Supp. 1008, 1012 (S.D.N.Y.1988)).  However, in order for cummulative errors to justify habeas relief, the court must find that they are actually "errors." *Joyner v. Miller*, No. 01 Civ. 2157, 2002 WL 1023141, at * 13 (S.D.N.Y. Jan. 7, 2002) (citations omitted).  The court must first find errors, and if no single error justifies a reversal, all the errors must be assessed for their prejudicial effect. *Sanders*, 701 F. Supp. at 1013; *Brumfield*, 297 F. Supp. 2d at 621.

In order for the habeas petitioner to be successful on such a claim, the errors must be 'so prejudicial that they rendered petitioner's trial [ ] fundamentally unfair.' " *Joyner*, 2002 WL 1023141, at * 13 (quoting *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y.1995).  "Fundamental fairness" has been defined very narrowly. *Dowling v. United States*, 493 U.S. 342, 352 (1990).  It is not sufficient to simply aggregate rulings that might have been unfavorable to the petitioner. *Collins*, 878 F. Supp. at 460 (citing *United States v. Rivera*, 900 F.2d 1462, 1470-71 (10th Cir.1990) (*en banc*)).

In this case, this court has not found any errors based upon petitioner's grounds

for relief.  Therefore, there can be no claim based upon "cummulative errors."

    **WHEREFORE**, based on the findings above, it is

    **RECOMMENDED**, that the petition be **DENIED and DISMISSED**

    Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have
fourteen days within which to file written objections to the foregoing report.  Such
objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO
THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE
REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v.
Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72.

Dated: November 17, 2010

                                        Hon. Andrew T. Baxter
                                        U.S. Magistrate Judge

61